Filed 11/5/15  In re C.D. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re C.D., a Person Coming Under the Juvenile Court Law. | B263722 (Los Angeles County Super. Ct. No. CK84145) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>G.D.,<br><br>      Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra L. Losnick, Juvenile Court Referee.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

G.D. (mother) appeals from the dependency court's April 14, 2015 order terminating her parental rights under Welfare and Institutions Code section 366.26[1] and selecting adoption as the permanent plan for her son, C.D. Mother contends the court erred when it found no statutory exception applied to prevent termination of her parental rights. We affirm.

**FACTS AND PROCEDURAL HISTORY**

Mother has been on disability and taking prescription medications since the mid-2000s, after a hip replacement and a broken neck. On August 18, 2010, she gave birth to C.D., who was born with opiates in his system and spent 21 days in the neonatal intensive care unit. C.D. has a biological father,[2] but his birth certificate lists two women: mother and Mary Kay, his current caregiver.

When C.D. was almost a year old, the Los Angeles County Department of Children and Family Services (Department) learned that mother had a history of drug abuse, including heroin and prescription drugs. Mother claimed she had been sober for 16 years, but relapsed on heroin for the last 9 months. The Department opened a voluntary family maintenance case in July 2011, and closed the case in December 2011, with mother being minimally compliant with the case plan. A February 2012 referral of emotional and physical abuse by mother was closed as unfounded.

According to Mary Kay, she and mother separated in the summer of 2012, and because she and mother were not married, she had to give up any parental rights to C.D. After living separate from Mary Kay for about seven months, mother and C.D. returned to live with Mary Kay in December 2012, although Mary Kay acknowledged she and mother were no longer a couple. Around the same time, the Department found

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.

[2] Father's parental rights were terminated, but he is not a party to this appeal.

inconclusive a referral expressing concern mother was "doctor shopping" based on a statewide database that showed mother sought drugs such as methadone and strong painkillers from multiple doctors. In the spring of 2013, mother was convicted of driving under the influence and driving on a suspended license.

In June 2013, the Department received another referral regarding mother's use of painkillers and concerns about mother "doctor shopping." The Department interviewed mother, Mary Kay, and father. At a team decisionmaking meeting (TDM) involving the Department and all three parents, it was agreed that mother would move out of Mary Kay's home and C.D. would be detained from mother and father and placed with Mary Kay. At the detention hearing, the court granted mother visitation for a minimum of three times or three hours per week.

On September 17, 2013, the court sustained the Department's dependency petition based on mother's history of substance abuse and current use of alcohol and prescription medication. The court ordered C.D. placed with father, on the condition that both father and son stay at Mary Kay's residence. It continued monitored visitation for mother, and ordered family enhancement services including a drug treatment program, drug and alcohol testing, individual counseling, a psychological assessment, and parenting classes.

In January 2014, the Department expressed concern about mother's continued drug seeking behavior and inability to maintain sobriety. Mother's drug tests were negative, but she missed a test date and admitted she had relapsed and consumed alcohol. Mother was concerned she would test positive on her next test date, but the test came back negative. Mother also admitted to an incident where she found "cotton" (a method of using heroin) in her purse and took it, but then threw it up and took laxatives for fear of testing positive. Mother said it was not considered a relapse. Mother was taking a Thai herb called Kratom and other drugs and herbs that would allow her to obtain a high without her drug tests coming back positive. Mother was diagnosed with major depression, and reported she was taking multiple prescription medications including Wellbutrin, Trazadone, Baclofen, and Neurontin. Mother consistently visited C.D., and the visits were mostly positive, but Mary Kay expressed concern about continuing to act

as a monitor because mother would at times overstep her boundaries and not listen to redirection or parenting suggestions. During one visit, mother almost gave C.D. an excessive dose of Sudafed, and when Mary Kay pointed it out, mother laughed and said "that's what happens when I take Sudafed." Mary Kay wanted to be C.D.'s legal guardian so she could add him to her medical insurance and seek financial assistance. She was willing to continue caring for C.D. long term.

For the March 2014 hearing on mother's section 388 petition[3] seeking unmonitored visitation, the Department took the position that granting mother unmonitored visitation would not be in C.D.'s best interests. Mother had not been able to demonstrate stability and maintain sobriety for a significant period of time. She was in her third sober living facility in six months, having been asked to leave her last one on March 6, 2014. She had also switched sponsors four times in the last six months. Mary Kay was monitoring mother's visits with C.D. Mary Kay and C.D. were attending weekly therapy sessions, and the therapist reported that C.D. feels safe in Mary Kay's care and is able to seek her out for attention, affection, reassurance, and safety. The court denied mother's section 388 petition, finding the requested change would not promote C.D.'s best interests.

In its May 2014 report, the Department noted mother continued to visit C.D. three times a week for three hours a visit or longer. C.D. was closely bonded to Mary Kay, who was able and willing to meet the child's needs. She informed the social worker she was willing to adopt C.D. if mother failed to reunify. Father was supportive of Mary Kay becoming C.D.'s legal guardian or adoptive parent as well, and he opposed C.D.'s return to mother's custody. The Department recommended that the court end mother's reunification services based on her prior resistance to treatment and her extensive and chronic substance abuse history.

---

[3] Section 388 permits a parent to petition the court for a hearing to change an earlier order in the dependency proceeding.

In June 2014, the Department reported that mother dropped C.D. off after a visit and reported that he had pinkeye. Mary Kay was concerned that mother did not attend to C.D.'s medical needs during the afternoon visit, as the teacher had told mother and the monitor C.D. had stuff in his eye when he woke up from his nap. In discussions about the possibility of Mary Kay adopting or becoming C.D.'s guardian, mother worried she would not get enough visitation. Mother suggested Mary Kay was also culpable in the situation because she entered into a domestic partnership with mother even though mother had substance abuse issues. The Department also learned that mother had not completed individual therapy as she had previously represented. C.D. had a close bond with Mary Kay, who was providing him with excellent care and supervision and was committed to providing him a permanent home through adoption.

The court terminated mother's reunification services, scheduled a selection and implementation hearing, and granted Mary Kay de facto parent status. Mother filed two additional section 388 petitions on September 25 and December 15, 2014, seeking unmonitored visits, but both were denied without a hearing.

Based on later reports by the Department, Mary Kay's relationship with C.D. continued to be stable and bonded as Mary Kay went through the process of obtaining approval to adopt C.D. Two of mother's three weekly monitored visits were moved to the Department offices because of concerns that the monitor, who was mother's friend and manager of the sober living facility where mother resided, was not adequately monitoring the visits. Mother called the Department hotline expressing concern about a neighbor hanging around Mary Kay's house and showing her a bottle of Ketamine, but the Department decided against further investigation.

After several continuances, the court held a selection and implementation hearing under section 366.26 on April 14, 2015. The court took judicial notice of its earlier orders, and admitted into evidence mother's case plan, the Department's reports, and several photographs of mother's home. It heard testimony from the social worker, mother, and mother's friend who served as a visitation monitor for about a year and who was also manager of a sober living facility where mother had lived. The friend testified

C.D. was affectionate with mother and called her "mommy." She further testified that C.D. has a loving relationship with mother, enjoys his time with her, and trusts and is affectionate with the monitor as an extension of mother.

Mother's counsel acknowledged that mother never obtained unmonitored weekend visitation, but emphasized that mother spent a significant amount of time with C.D. in visitation, up to 25 hours per week at the beginning of the case, and pointed out that she has done everything a parent could do during her limited visitation time. Counsel argued that mother's regular and consistent contact with C.D. supported the parental relationship exception and asked the dependency court not to terminate mother's parental rights. Attorneys for C.D. and the Department urged the court to find no applicable exception and terminate mother's parental rights. The court found that the exception under section 366.26, subdivision (c)(1)(B)(i) did not apply and terminated mother's parental rights.

## DISCUSSION

### Substantial Evidence Supports the Dependency Court's Finding

Mother contends the dependency court erred when it found the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i) inapplicable, and seeks reversal of the order terminating her parental rights. We find no error.

We review the court's order on the parental relationship exception for substantial evidence.[4] (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.) If supported by substantial

---

[4] "As mother recognizes, some courts have applied different standards of review. (*In re K.P.* [(2012)] 203 Cal.App.4th [614,] 621-622 [question of whether beneficial parental relationship exists is reviewed for substantial evidence, whereas question of whether relationship provides compelling reason for applying exception is reviewed for abuse of discretion]; *In re C.B.* (2010) 190 Cal.App.4th 102, 122-123 [abuse-of-discretion standard governs review, but 'pure' factual findings reviewed for substantial evidence]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard].) On the record before us, we would affirm under either of these standards. (E.g., [*In re*] *Jasmine D., [supra,]* at p. 1351 [practical differences between

6

evidence, the finding must be upheld, even though substantial evidence may also exist that would support a contrary result and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

Under section 366.26, subdivision (c)(1)(B)(i), if the dependency court terminates reunification services and finds the child is adoptable, it must terminate parental rights unless it "finds a compelling reason for determining that termination would be detrimental to the child due to [the circumstance that the parent has] [¶] . . . maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

Although mother maintained consistent visitation with C.D. in this case, there is substantial evidence to support a finding that the second prong of the exception was not satisfied. The parental relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . .' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549,

substantial evidence and abuse of discretion standards are minor].)" (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166, fn. 7.)

555, fn. omitted.) "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Mother's relationship with C.D. did not promote C.D.'s well-being "'to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534; accord, *In re Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1347-1350.) Five-year-old C.D. is in the fortunate position of having two women in his life who love him and care deeply about his welfare. Mary Kay has been a consistent caregiver for C.D. for his entire life, with the exception of six or seven months after mother and Mary Kay separated and mother took C.D to live with her father. The reports consistently described the positive and bonded relationship between C.D. and Mary Kay. Mother also played a significant role in his life, even after the Department filed its petition in the summer of 2013. She has maintained consistent visitation, C.D. calls her mommy, and he is happy to see her when she visits. While these factors might persuade a judge that a continued relationship with mother might provide some measure of benefit, it does not suffice to establish that C.D. would suffer detriment if the relationship was ended, or that a court erred in finding that there was no evidence of detriment. Mother did not offer a bonding study or any other evidence of why the prospect of a continued relationship with mother would outweigh the benefits of a permanent relationship with Mary Kay. We recognize that the court's action terminating mother's parental rights will mean that Mary Kay, C.D.'s prospective adoptive parent, will have the legal right to restrict or even end mother's visits should she choose to do so. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 300 ["[w]e do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"].) However, we do not second-guess the dependency court's determination that the benefit of permanency outweighs any possible benefit of legally preserving the relationship between C.D. and mother. The court's determination the parental relationship exception does not apply in this case is supported by substantial evidence.

## DISPOSITION

The order terminating mother's parental rights is affirmed.


       KRIEGLER, J.


We concur:


       TURNER, P.J.


       MOSK, J.